**Alisa Ann CARAKER and Keith Allen Caraker, Plaintiffs,**

v.

**SANDOZ PHARMACEUTICALS CORP. and Sandoz AG, Defendants.**

**No. 96–CV–4113–JPG.**

United States District Court, S.D. Illinois.

Sept. 4, 2001.

Ellen Relkin, Richard S. McGowan, Catherine T. Heacox, Jerry Kristal, Jill

Mandell, Denise Denleavy, Weitz & Luxenberg, New York City, Martin L. Perron, Perron Law Firm, St. Louis, MO, for Plaintiffs.

Dennis P. Orr, Grant J. Esposito, Mayer, Brown, et al., New York City, Suzanne P. Galvin, Fox, Galvin, LLC, St. Louis, MO, Steven P. Sanders, Williams, Venker, et al., St. Louis, MO, for Sandoz AG.

Deirdre C. Gallagher, Katherine R. Latimer, Armstrong Teasdale, LLP, St. Louis, MO, Joe G. Hollingsworth, Gary Rubin, Rona Endlich, William J. Cople, Jonathan M. Weinrieb, Spriggs & Hollingsworth, Washington, DC, Steven P. Sanders, Williams, Venker, et al., St. Louis, MO, for Sandoz Pharmaceuticals Corp.

## MEMORANDUM OPINION & ORDER

GILBERT, District Judge.

Plaintiffs Alisa and Keith Caraker have sued the defendants, Sandoz Pharmaceuticals Corporation and Sandoz A.G.,[1] alleging products liability claims. Before this Court are:

1.) Sandoz' motion for reconsideration of this Court's denial of its Motion for Summary Judgment filed February 17, 1999, along with Sandoz' supporting memorandum, the Carakers' response, and Sandoz' reply (Docs.201, 202, 209, 219);

2.) Sandoz' motion for summary judgment as to the Caraker's products liability claims based on the recent Supreme Court case of *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), along with Sandoz' supporting memorandum, the Carakers' response, and Sandoz' reply (Docs.254, 255, 256, 258);

3.) Sandoz' motion for order to preclude reference to Dr. Karl Engelman's Conviction on Misdemeanor Charges in August 1978, along with Sandoz' supporting memorandum, the Carakers' response, and Sandoz' reply (Docs.274, 275, 278, 300)

4.) The Carakers' motion to supplement their memorandum in opposition to Sandoz' motion *in limine* to exclude causation testimony and to include new exhibits, along with Sandoz' response (Docs.304, 309)

5.) Sandoz' unopposed motion to strike the Caraker's response to Sandoz' notice of affirmance of previously cited authority (Doc. 305).

## I. BACKGROUND

This is a products liability case that involves the drug Parlodel, a postpartum lactation-control drug manufactured, delivered and sold by Sandoz.

On the evening of May 9, 1988, after an uneventful pregnancy, 24–year–old Alisa Caraker delivered her infant at Memorial Hospital of Carbondale ("Carbondale Memorial") via a normal cesarean section (*i.e.*, an incision through the abdominal and uterine walls for delivery of a fetus) because her infant was too large for her birth canal. The surgery was uneventful. Mrs. Caraker did not have obstetrical (*i.e.*, the branch of surgery dealing with the management of pregnancy and labor) risk factors for her stroke.

On May 10, 1988, Mrs. Caraker began taking Parlodel, prescribed at 2.5 mg twice per day for 14 days because she had elected not to breast feed. On May 11, 1988, while still in the hospital, Ms. Caraker reported developing headaches. During her hospitalization, she also experienced

---

1. Sandoz Pharmaceuticals Corporation is now known as Novartis Pharmaceuticals Corporation. Sandoz A.G. is also a defendant in this action. For clarity, this Court will refer to them as "Sandoz." Also, this Court will refer to the plaintiffs collectively as "the Carakers," unless otherwise noted.

some transient elevated blood pressure. On May 13, 1988, Mrs. Caraker was discharged in good health, but, after returning home, Mrs. Caraker's headaches progressively became much worse.

On May 15, 1988, she awoke with a severe headache and vision problems and was rushed back to Carbondale Memorial. It was noted on admission that Mrs. Caraker was a healthy 24 year old woman, one week postpartum, with no complications during pregnancy, and a normal blood pressure before, during, and after delivery. She reported that the only medication she was currently taking was Parlodel. That day, a CT scan (*i.e.*, a method of examining the body's soft tissues using X-rays, with the beam passing repeatedly through a body part and a computer calculating tissue absorption at each point scanned) revealed a large, left-sided intracerebral hematoma ("ICT")[2] due to intracerebral hemorrhaging/bleeding. Mrs. Caraker was then transferred to St. Francis Medical Center ("St. Francis") where she underwent brain surgery to remove the hematoma and stop the bleeding. Before operating, the surgeon, Dr. Kim, noted that X-rays indicated no pre-existing blood malformation, but that either a cryptic AVM or a postpartum hemorrhage was a possibility. The operation records indicate again the possibility of a cryptic AVM. On May 17, 1988, St. Francis sent a letter to Carbondale Memorial reporting that Mr. Caraker had indicated that the labor was stressful and prolonged, that they assumed Mrs. Caraker had suffered from intracerebral hemorrhage during labor, but also that the stroke could be complete-ly unrelated to the delivery. Upon her discharge on May 23, 1988, it was noted that her recent labor was delayed but that the cesarean delivery was normal. The Carakers spoke with Dr. Kim, who could not identify the cause of the stroke; nor could Dr. Smaga explain the stroke to Mrs. Caraker at a follow-up visit.

The Carakers filed their complaint on March, 25, 1996, against Parlodel manufacturer Sandoz, in which they assert design defect, failure to warn, and negligence theories claims.

## II. *DISCUSSION*

Before this Court are Sandoz' motion for reconsideration of this Court's ruling on its previous filed Motion for Summary Judgment filed over two years ago on February 17, 1999, a summary judgment motion based on of *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), and other miscellaneous motions. This Court will first address the reconsideration motion, then the *Buckman* summary judgment motion, and lastly the miscellaneous motions.

### A. *Reconsideration Motion*

On June 7, 1999, this Court denied a summary judgment motion filed by Sandoz (Docs.107, 109, 119, 122). On November 9, 2000, almost a year and a half later, Sandoz filed a motion to reconsider that June 7, 1999, Order (Doc. 202), claiming that "new law" and "new facts" justify a reversal of this Court's June 7, 1999, Order denying summary judgment on the statute of limitations issue.[3] The Carakers re-

---

**2.** An ICT is a collection of blood, usually clotted, within the cerebrum due to a break in the wall of a blood vessel. More specifically, an ICT is a type of cerebral ischemic stroke (*i.e.*, a sudden sever attack brought about by a deficiency of blood in part, usually due to functional constriction or actual obstruction of a blood vessel of an area of the brain).

This is also referred to as a cerebral infarction (*i.e.*, sudden insufficiency of arterial or venous blood supply due to various factors), and results is local tissue death and usually a persistent localized neurological deficit in the area of distribution of one of the cerebral arteries.

**3.** This Court notes that there are instances where Sandoz refers to a page in an attached

sponded, arguing that there is nothing "new" in the Motion for Reconsideration (Doc. 209).[4] They note that Sandoz' "new cases" actually support this Court's denial of summary judgment, and that its "new facts" were previously available and thoroughly discussed in the June 7, 1999, Order.

■■■■ A motion to reconsider is not designed to relitigate issues previously decided on summary judgment. In *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264 (7th Cir.1996), the Seventh Circuit outlined the proper standard for motions to reconsider:

Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion. To support a motion for reconsideration based on newly discovered evidence, the moving party must "show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence during the pendency of the motion." Disposition of a motion for reconsideration is left to the discretion of the district court, and its ruling will not be reversed absent an abuse of that discretion.

\* \* \* \* \* \*

■■■■ Belated factual or legal attacks are viewed with great suspicion, and intentionally withholding essential facts for later use on reconsideration is flatly prohibited. Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion. *Id.* at 1269–70 (citations and internal quotations and brackets omitted). *See Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251–52 (7th Cir.1987). This standard applies to both grants and denials of summary judgment motions. *See Caisse*, 90 F.3d at 1270 ("Disposition of a motion for reconsideration is left to the discretion of the district court, and its ruling will not be reversed absent an abuse of that discretion."); *see also Davidson & Schaaff, Inc. v. Liberty Nat. Fire Ins. Co.*, 69 F.3d 868, 871 (8th Cir.1995); *Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1178 (9th Cir.1998); *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 355 n. 62 (5th Cir.1989).[5]

### 1. *The June 7, 1999, Order Denying Summary Judgment*

On February 17, 1999, Sandoz Pharmaceuticals filed a motion for summary judgment arguing for the second time that the Carakers' claims were barred by the statute of limitations (Doc. 107). They claimed that because Mrs. Caraker suffered from an injury resulting from a "traumatic event," the statute of limitations began to run on the date of injury, May 15, 1988, and could not be tolled under the discovery rule. Sandoz contended that, even if the discovery rule did apply to this case, the Carakers knew or should have known by 1989, at the latest, that the stroke had a wrongful cause. The Carakers responded that they could not

___

exhibit when that page was not, in fact, attached.

**4.** For purposes of this motion, this Court did not consider the videotape submitted by the Carakers.

**5.** The standard is not the one Sandoz advances, *i.e.*, anytime "where [a] party offers new evidence." (Doc. 202 at 1).

have learned of the wrongful cause of the injury until Mrs. Caraker read a magazine article in June of 1994 (Doc. 119). They claim that a genuine issue of fact existed precluding summary judgment. Sandoz replied, arguing that the facts were inadequately disputed and that many of the Carakers' arguments were unsupported by Illinois law (Doc. 122).

In rejecting Sandoz Pharmaceuticals' statute of limitations argument yet again, this Court noted that the discovery rule tolls the running of the statute of limitations until a plaintiff reasonably should have known of her injury and that it was wrongfully caused. This Court rejected Sandoz' argument that the discovery rule was inapplicable because the Mrs. Caraker's injury was a "traumatic event." This Court noted that, in general, when an injury resulted from a sudden, traumatic event, the suddenness of the injury should ordinarily put a reasonable person on notice that she should inquire as to whether that injury was wrongfully caused. However, this Court adopted the reasoning in a line of cases which held that if the alleged wrongful cause was unknown to the plaintiff at the time the injury was sustained, and a non-negligent cause was apparent, then the discovery rule tolls the statute of limitations despite the traumatic event. In short, this Court recognized three rules: (1) The statute of limitations starts when the plaintiff should have known of the injury *and* the wrongful cause of the injury; (2) Sudden, traumatic events generally put a plaintiff on notice of their injury and the fact that it was probably wrongfully caused; (3) However, if the traumatic event has an apparent *non-negligent cause* at the time of the injury, the plaintiff is not automatically charged with the knowledge of the *wrongful cause,* in which case the discovery rule would apply.

This Court then applied those three rules, finding that a genuine dispute existed as to whether the Carakers reasonably believed that the childbirth was the cause of the stroke. As there was evidence that this was a non-negligent cause of the stroke, the Court found that it could not hold, as a matter of law, that the discovery rule did not apply. Because the discovery rule merely tolls the statute of limitations until such time as it was reasonable for the plaintiff to have discovered the cause, this Court noted that the Carakers still had to show that they brought the claim within two years of when they should have known that the stroke was wrongfully caused.

This Court noted that whether the Carakers possessed enough information about the injury and its cause to put a reasonable person on notice that there may be an action at law was normally a question of fact, unless the evidence could lead to only one conclusion. Sandoz argued that the Carakers were on notice sometime in 1988 or 1989 when the Carakers contacted an attorney and began investigating the cause of the stroke. This Court rejected Sandoz' argument that evidence of contact with an attorney means that, as a matter of law, the Carakers should have known that the injury was wrongfully caused. This Court found this to be only evidence that the Carakers were diligent in pursuing some legal remedy. This Court ultimately found that the evidence created a genuine issue of fact as to whether the Carakers' contact with an attorney, Patrick McCann, would have put a reasonable person on notice of a possible claim. The Court also rejected Sandoz' argument that, as a matter of law, the available product information was sufficient to put Carakers on notice over two years before they ultimately filed suit.

### 2. *Sandoz' Reconsideration Grounds*

Sandoz advances both a "new law" argument and a "new facts" argument. This Court will address each in turn.

### a. The New Law Argument

■ As to the "new law" argument, Sandoz simply reargues their legal position that the discovery rule does apply where a traumatic event caused the injury, even where the plaintiff adduces evidence that the alleged wrongful cause was unknown to her at the time the injury was sustained, and a non-negligent cause was apparent.

This Court need not address these re-arguments at length, as this Court already has. This Court rejected this argument for good reason:

> In *Hochbaum,* the plaintiff alleged that her attempted suicide was caused by Prozac. *Id.* [686 N.E.2d] at 627. The court noted that the 1974 *Berry [v. G. D. Searle & Co.,* 56 Ill.2d 548, 309 N.E.2d 550 (1974)] decision, which held that the discovery rule is not to be applied to traumatic injuries, has since been modified as follows: "Where a traumatic injury is sustained in the absence of an apparent non-negligent cause, it is fair to place a burden on the injured party to inquire as to the actual cause. On the other hand, in the case of an injury that appears to have been caused by some non-negligent event, such as an illness, and the actual cause is unknown, the injured party has no reason to conduct such an inquiry and to require him or her to do so would be patently unfair." *Id.* at 630. . . . The court relied on a line of cases in which the injuries were traumatic events, but the plaintiffs had pre-existing illnesses that they could have reasonably believed caused their injuries. *See Hochbaum,* 686 N.E.2d at 630 . . . In *Hochbaum,* the plaintiff had a history of depression precipitating her Prozac treatment. *Id.* at 628–29. The court found that a genuine issue of fact existed as to whether the plaintiff, at the time of the traumatic suicide attempt, believed that the attempt was caused by her history of de-

pression, rather than by the Prozac treatment. *Id.*

The Carakers analogize their situation to the plaintiff's situation in *Hochbaum.* They claim that at the time of the stroke the actual cause was unknown and the only possible causes given were the childbirth or a cryptic AVM—both non-negligent causes. They claim that there was no reason to have searched for a wrongful cause in the face of these natural explanations. The defendants contend that childbirth is not a preexisting illness like depression. They claim that the Carakers had no reason to believe that the stroke was the result of a non-negligent cause because Alisa Caraker was healthy and no other explanation for the stroke was ever found.

The Court finds that a genuine dispute exists as to whether the Carakers reasonably believed that the childbirth was the cause of the stroke. Although the labor and delivery were normal and uncomplicated according to the doctors, the Carakers' experience was long and painful. Childbirth is not an illness, as the defendants point out, but the principles stated in *Hochbaum* are not limited to preexisting *illnesses* only. Rather, those cases assert that if a natural explanation existed for the plaintiff's injury which reasonably masked the alleged negligent cause, the statute of limitations should be tolled under the discovery rule until it would be fair to hold the plaintiff responsible for discovering his or her claim. Certainly any preexisting conditions could constitute an apparent non-negligent cause under the right circumstances; the courts could not have intended to limit these principles to clinically diagnosed illnesses.

A jury could find that the Carakers reasonably believed that, without knowing any other definite cause, the stroke was caused by the recent childbirth, es-

pecially in light of the doctors' initial conclusions that the childbirth was a possible cause.... (Doc. 125 at 10–12). Sandoz is simply rehashing previously rejected arguments. That is exactly what *not* to do in a motion to reconsider. *See Caisse*, 90 F.3d at 1269 ("Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.").

The only new cases cited by Sandoz are *Lowe v. Ford Motor Co.*, 313 Ill.App.3d 418, 246 Ill.Dec. 378, 730 N.E.2d 58 (2000) and *Paige–Myatt v. Mount Sinai Hosp. Medical Center*, 313 Ill.App.3d 482, 246 Ill.Dec. 257, 729 N.E.2d 908 (2000). Neither Illinois Appellate Court decision mandates a different outcome in this case. In *Lowe*, the court applied the general rule that an injury caused by a sudden, traumatic event starts the statute of limitations. However, the *Lowe* court had no occasion to talk about the *Hochbaum* exception to that rule. So this case is not particularly helpful. In *Paige–Myatt*, the court did not even mention the "sudden, traumatic event" concept and how it related to the discovery rule. There, a hysterectomy patient who had her femoral nerve damaged during surgery felt pain immediately after surgery, but received medical opinions that such pain was most likely caused by the hysterectomy. If the starting date was the date on which the hysterectomy occurred and on which she immediately felt pain, the statute of limitations would have run. But, in reversing the trial court, the *Paige–Myatt* court found that the plaintiff's surgeon's statements that such pain was a normal incident of surgery supported the application of the discovery rule and did not support a start

date of the date she first felt the pain after the hysterectomy. In so ruling, the *Paige–Myatt* court relied on *Licka v. William A. Sales, Ltd.*, 70 Ill.App.3d 929, 27 Ill.Dec. 212, 388 N.E.2d 1261 (1979), a case in which the court held that the discovery rule applied in situations where immediate pain "could have been consistent with a non-negligent failure of the operation or with normal post-operative pain." This case actually helps support the Carakers' argument.

In any event, neither case is more convincing than *Hochbaum*. In fact, since *Hochbaum*, federal courts have recognized the validity of the "non-negligent cause" exception to the "sudden, traumatic event" general rule. *See Ellis v. Howmedica Inc.*, 1999 WL 1068474, *3–4 (N.D.Ill. Nov. 22, 1999) (No. 99 C 2125) (discussing "modern line of cases" relaxing strict interpretation of "sudden, traumatic event" rule where there is a non-negligent cause to injury); *cf. Golla v. General Motors Corp.*, 167 Ill.2d 353, 212 Ill.Dec. 549, 657 N.E.2d 894, 901 (1995) (distinguishing cases where the plaintiffs could have "reasonably assumed that physical injuries arising during the course of medical treatment were simply a natural consequence of their preexisting illness, rather than the result of negligent conduct").[6]

*Hochbaum* is good law, and this Court was not wrong to apply it to the facts of this case. Accordingly, this Court rejects Sandoz' motion to reconsider on their "new law" basis for the same reasons this Court outlined in its previous rejection of that argument. Finally, to the extent that Sandoz is advancing any new legal arguments, this Court rejects them. *See Bally Export Corp. v. Balicar Ltd.*, 804 F.2d 398, 404 (7th Cir.1986); *Caisse*, 90 F.3d at 1270.

---

**6.** Interestingly, in Sandoz' motion *in limine*, Sandoz takes a contrary position, *i.e.*, that there are other "plausible alternative causes

of plaintiff's stroke" like "physiological changes" experienced in the "postpartum period" (Doc. 213 at 3, 7).

#### b. The New Facts Argument

Sandoz advances three so-called "new facts" arguing that these facts are proper grounds for this Court to reconsider its ruling on the statute of limitations issue: (1) publicly available information; (2) testimony from Patrick McCann; and (3) testimony from Tina Glastetter. This Court will address each in turn.

##### i. *Publicly Available Information*

■ In its motion, Sandoz regurgitates its old arguments that the inserts and so on should have put the Carakers on notice that Parlodel was the cause of the stroke. This Court already dealt with this argument at length:

> The defendants also contend that because information about Parlodel and its connection with strokes was widely available in 1988, the Carakers should have known that the stroke could have been wrongfully caused. The Carakers maintain that whatever was available was not written for lay people and, thus, should not be considered sufficient to have put the Carakers on notice of a possible claim.
>
> Although it is undisputed that there was a significant amount of information published and publicly available about the connection between Parlodel and strokes in postpartum women, there are an equal number of facts which call into question the reasonableness of the Carakers' failure to discover this information.
>
> The package insert clearly indicated a number of reported cases of strokes in postpartum women who took Parlodel; this warning was reprinted in the PDR; and several articles were published about the connection between strokes and Parlodel. However, there is a also evidence that all of this information was published in sources intended to inform medical personnel, not to warn patients or inform lay people. Nonetheless, the sources were available to the public, and anyone interested in learning the cause of an injury or the adverse reactions of a particular drug could do research at any public library. On the other hand, the Carakers have testified that they had no idea before 1994 that Alisa Caraker had even been taking the drug Parlodel, although the records indicated such and she knew she had taken something to prevent lactation. There was also a letter in 1990 from Dr. Kim absolutely ruling out the delivery as a possible cause of the stroke, which may be further evidence that the Carakers should have searched more diligently for a wrongful cause after that point.
>
> These facts do not lead to only one conclusion. A jury could determine that the Carakers should have been more diligent than they were or that they should have been more informed about Alisa Caraker's treatment than they were; on the other hand, a jury could also conclude that the Carakers' behavior under these circumstances was reasonable. Thus, summary judgment is inappropriate.

(Doc. 125 at 14–15). In short, whether or not the Carakers should have searched for and found such medical texts is, at the very least, a question for the jury. This Court again rejects this previously-rejected argument. *See Caisse,* 90 F.3d at 1269 ("Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion."). Finally, to the extent that Sandoz is advancing any new legal arguments, this Court rejects them. *See id.* at 1270 (noting that "a motion to reconsider is not the appropriate vehicle to introduce new legal theories").

##### ii. *Testimony From Patrick McCann*

■ Sandoz asserts that the December 14, 1999, and November 3, 2000, deposition

testimony of Patrick McCann is "newly discovered evidence" which constitutes a proper ground for this Court to reconsider its June 7, 1999, Order denying summary judgment on statute of limitations grounds. The Seventh Circuit has made it abundantly clear that motions to reconsider "cannot *in any case* be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion." *Caisse*, 90 F.3d at 1269 (quotations and citations omitted) (emphasis added).

Sandoz has not met their burden of showing "not only [1] that this evidence was newly discovered or unknown to it until after the hearing, but also [2] that it could not with reasonable diligence have discovered and produced such evidence during the pendency of the motion." *Id.* (quotation and internal quotation marks omitted). As the Carakers correctly point out, Sandoz only sought to depose McCann *after* this Court denied Sandoz' Motion for Summary Judgment. *Compare* Doc. 125 (June 7, 1999 Order denying summary judgment); *with* Doc. 202, Ex. B (McCann Dep. I, Dec. 14, 1999) and Ex. C (McCann Dep. II, Nov. 3, 2000). Their original motion makes clear that Sandoz could have, with reasonable diligence, discovered and deposed McCann before filing their motion for summary judgment. *See* Doc. 107 at 3 ("In 1988, ... plaintiffs ... consulted an attorney to review medical records....."). Therefore, this Court finds that it is not proper "newly discovered evidence" requiring this Court to reconsider its previous disposition of the statute of limitations issue. To the extent that Sandoz is rearguing facts previously available to them or

facts that they already argued in their original summary judgment motion, this Court finds that these are not proper grounds for a motion to reconsider. *See Caisse*, 90 F.3d at 1269 ("Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.").

iii. *Testimony From Tina Glastetter*

Sandoz also presents Tina Glastetter's December 15, 1999 and September 15, 2000 deposition testimony. This testimony suffers the same deficiency as McCann's. Sandoz has not made the required showing that this evidence is proper "newly discovered evidence" that would require this Court to reconsider its previous disposition of the issue at hand.[7] Accordingly, this Court rejects this evidence as a ground for reconsideration of its earlier ruling on the statute of limitations issue.

For all these reasons, this Court **DENIES** Sandoz' motion for reconsideration of this Court's denial of its Motion for Summary Judgment filed February 17, 1999 (Docs.201).

### B. *Buckman Summary Judgment Motion*

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Courts must view all evidence in the light most favorable to the nonmoving party and draw all inferences in the favor

---

7. Sandoz offers Glastetter's testimony as evidence of the date on which Caraker knew or should have known that her injury was wrongfully caused. However, Glastetter freely admits: "I'm not for sure on anything datewise.... I don't—I don't remember the dates." (Glastetter September 15, 2000, Dep. at 53).

of that party. *See id.* at 255, 106 S.Ct. 2505.

■ The Carakers assert various design defect, failure to warn, and negligence claims. They also allege overpromotion, but this allegation does not constitute a tort distinct from the inadequate warnings tort, because the overpromotion theory is simply that, by over-promoting a product, the over-promoter has de-emphasized or diluted the full effect of the warnings. *See Hill v. Searle Laboratories, a Div. of Searle Pharmaceuticals, Inc.,* 884 F.2d 1064, 1071 n. 3 (8th Cir.1989) (noting that overpromotion by a drug manufacturer may cause the prescribing physician not to rely on the warnings and package inserts associated with a particular drug product); *Plummer v. Lederle Laboratories, Div. of American Cyanamid Co.,* 819 F.2d 349, 358 (2d Cir.1987) (distinguishing *Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal. Rptr. 45, 507 P.2d 653 (1973), which imposed liability on a drug manufacturer because its overpromotion of a dangerous drug to the medical profession was coupled with a gross minimization of the risk of prescribing the drug in the product warnings); *Salmon v. Parke Davis & Co.,* 520 F.2d 1359, 1363 (4th Cir.1975) (noting that overpromotion nullifies effect of valid warnings); *Baldino v. Castagna,* 505 Pa. 239, 478 A.2d 807, 810 (1984); *Mahr v. G.D. Searle & Co.,* 72 Ill.App.3d 540, 28 Ill.Dec. 624, 390 N.E.2d 1214, 1238 (1979) (noting that overpromotion evidence is evidence showing that, in marketing the drug in question, the drug manufacturer tried to "play down" the warnings making them ineffective).

A common thread relevant to all these claims is that Sandoz' warnings were inadequate. Thus, a crucial question is whether Sandoz failed to adequately warn Mrs. Carakers' prescribing physician. But Sandoz argues that any claim or theory based on its failure to warn is impliedly preempted under *Buckman.*[8] Thus, before this Court reaches any of the merits of the Carakers' claim that Sandoz' failed to adequately warn Mrs. Caraker's prescribing physician with respect to the risks of taking Parlodel PPL, this Court must first consider whether the Carakers' claims are now preempted under *Buckman.*

■ Because *Buckman* involves preemption, this Court will briefly review some general preemption principles. The United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. This provision gave birth to the preemption doctrine, under which federal statutes and agency regulations may preempt state law. *See Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 369, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). A federal law or regulation may also preempt states from allowing a common law right of action to private citizens.[9]

8. Actually, one of the *amicus curiae* briefs filed in the *Buckman* case was a pharmaceutical association of which Novartis was a member. *Buckman,* Brief of Amicus Curiae Pharmaceutical Research and Manufacturers of America in Support of Petitioner The Buckman Company, 2000 WL 1339143, at *1 n. 2.

9. In *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Court held that a cigarette smoker's common law damage action alleging that the defendant cigarette manufacturer failed to adequately warn the plaintiff of the dangers of cigarette smoking was preempted by the federal Cigarette Labeling and Advertising Act. Similarly, in *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the plaintiff was killed at a railroad crossing by a train operated by the defendant. Federal regulations set a maximum speed for trains in this type of crossing, with which the defendant's train complied. The Court held that the regulations preempted the

Congress may preempt state law in one of three ways:

> State action may be foreclosed by express language in a congressional enactment, *see, e.g., Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), by implication from the depth and breadth of a congressional scheme that occupies the legislative field, *see, e.g., Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), or by implication because of a conflict with a congressional enactment, *see, e.g., Geier v. American Honda Motor Co.*, 529 U.S. 861, 869–874, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001). *See also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Here, express and field preemption are not at issue; implied conflict preemption is.

■ Sandoz argues that the traditional implied conflict-preemption principles operate to preclude all of the Carakers' claims. To be successful, Sandoz must therefore persuade this Court that allowing the Carakers to proceed with their common law claims would actually conflict with FDA regulations/determinations. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). They can prove a conflict only by showing that either (1) it is impossible for an individual to comply with both the challenged state law (in this case, a common law duty to adequately warn physicians

prescribing Parlodel of the risks of taking the drug, the breach of which gives rise to a traditional failure-to-warn tort claim) and federal law; or (2) the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Crosby*, 530 U.S. at 373, 120 S.Ct. 2288. *See United States v. Locke*, 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000); *Dalton v. Little Rock Family Planning Services*, 516 U.S. 474, 476, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996); *Freightliner*, 514 U.S. at 287, 115 S.Ct. 1483; *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *California v. ARC America Corp.*, 490 U.S. 93, 100–101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). Clear evidence of a conflict between the state and federal law such as these permits a court to infer an intent to preempt the state law. *See Geier*, 529 U.S. at 869–874, 120 S.Ct. 1913.

■ Sandoz argues that Illinois' traditional common law duty imposed on drug manufacturers to adequately warn learned intermediaries of the risks of taking a particular drug is preempted by federal law under both scenarios. First, Sandoz argues that, if Illinois state law held Sandoz to a higher standard of timely warning drug users, via their learned intermediary, about the risks of taking Parlodel (even after new information surfaces after FDA approval), any state jury verdict based on that duty would actually conflict with the FDA's determinations initially approving Parlodel to be marketed with its warning

states from allowing the plaintiff a common law negligence recovery, since allowing a recovery would be tantamount to additional state regulation in an area preempted by the federal regulations. Similarly, in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Court agreed that a federal statute preempting state law requirements regarding medical devices applied to

state common law damages actions as well as to state statutes and regulations. *Buckman* itself preempted a common law "fraud on the FDA" cause of action. The rationale is that, when a state is allowing a private plaintiff to recover damages based on a common law tort claim, the state is "regulating" just as surely as if the state passed a statute or form administrative regulation.

label. Second, Sandoz argues that, allowing Illinois to enforce its traditional common law duty to warn against drug manufacturers would stand as an obstacle to the accomplishment of the federal objective of the FDA to regulate drug warning labels.

The Carakers respond. First, the Carakers argue that there is no direct conflict because the FDA generally lays down "minimum standards" that do not preempt state law standards. Second, the Carakers argue that Illinois' traditional common law duty to warn stands as no significant obstacle to the accomplishment of the federal objective, inasmuch as the federal objective is to have drug manufacturers take the initiative and attempt to strengthen existing warnings whenever they see, or should see, the need. Accordingly, the Carakers argue that implied preemption does not foreclose their state common law claims.

This Court finds that Sandoz failed to carry its burden of showing that the Carakers' claims based on failure to warn theories are implied preempted.

 First, this Court starts its analysis with an anti-preemption presumption. In the absence of express preemption, there is a strong "basic assumption" that Congress did not intend to displace state law. *See Maryland v. Louisiana,* 451 U.S. 725, 726, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). This presumption is even stronger where the federal legislation or regulations involve areas in which the States "have traditionally occupied," and courts must presume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Geier,* 529 U.S. at 907, 120 S.Ct. 1913 (quotation omitted). Protecting health and safety is an area traditionally

occupied by the States. *See Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240 (noting "the historic primacy of state regulation of matters of health and safety"). Illinois' duty that manufacturers of dangerous products warn individuals as to the product's dangers falls within the state's traditional role of protecting the health and safety of its citizens. Therefore, this Court must apply the anti-preemption presumption absent "clear evidence" of an intent on the part of Congress or the FDA to impliedly preempt state products liability claims. *See Buckman,* 121 S.Ct. at 1019, 121 S.Ct. 1012 (implied preemption case) (engaging in analysis as to whether anti-preemption presumption applied; distinguishing *Silkwood* because, "[i]n the present case ... we have *clear evidence* that Congress intended" preemption); *Geier,* 529 U.S. at 885, 120 S.Ct. 1913 ("[W]e certainly accept the dissent's basic position that a court should not find pre-emption too readily in the absence of *clear evidence* of a conflict...."); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (noting that historic police power of the states to regulate matters of health and safety is not preempted "unless that was the clear and manifest purpose of Congress.").[10]

Second, Sandoz failed to overcome the anti-preemption presumption by showing clear evidence that the Carakers' claims based on failure to warn theories should be implied preempted based on a direct conflict. Put another way, Sandoz failed to show that it is impossible for a drug manufacturer to comply with both the challenged state law (*i.e.,* a common law duty to adequately warn physicians prescribing

---

**10.** *Buckman* applied no anti-preemption presumption because the petitioner asserted a "fraud on the FDA" claim and petitioner's

"relationship" and "dealings with the FDA" were not of traditional State concern.

Parlodel of an elevation in the risk of taking the drug) and federal law.

■■■ The reason why many courts find no preemption is that the FDA's drug labeling decisions impose only "minimum" standards that are open to supplementation by state law through a jury's verdict enforcing a manufacturer's common law duty to warn.[11] Indeed, in *Geier*, the Supreme Court observed that federal agencies might reasonably view their safety standard "as a minimum standard" of care. 529 U.S. at 874–875, 120 S.Ct. 1913 ("In petitioners' and the dissent's view, [the safety standard] sets a minimum airbag standard.... But that was not the Secretary's view."). *Cf.* 30 Fed.Reg. 993 (1965). This "minimum" standards approach also accommodates other rationales used by courts, namely, that state law supplements FDA regulation by creating a compensatory mechanism not available under federal law. *See, e.g., Mazur,* 742 F.Supp. at 247;

*Feldman v. Lederle Laboratories,* 125 N.J. 117, 592 A.2d 1176, 1192 (1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). Because there is no evidence that either Congress or the FDA intended on scraping state products liability claims based on a failure to warn (as this Court will discuss later), it is reasonable to find that the FDA has imposed a minimum—as opposed to conclusive—standard of safety.

■■■ Further, even if drug manufacturer adequately warned prescribing physicians at the time of approval, drug manufacturers can always strengthen existing warnings or petition for a strengthening of the warnings, in a timely way, when new risk information surfaces. *See* 21 C.F.R. § 314.70. The regulations contemplate that information may arise before and after application approval that, in the mind of the manufacturer, calls into question the current safety of the drug with respect to

11. *See, e.g., Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 746 (11th Cir.) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes."), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 795 P.2d 915, 931 (1990); *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374, 391 (1984); Restatement (Second) of Torts § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."); *Hill,* 884 F.2d at 1068 ("FDA approval is not a shield to liability.... FDA regulations are generally minimum standards of conduct unless Congress intended to preempt common law, which Congress has not done in this area."); *Kociemba v. Searle & Co.,* 680 F.Supp. 1293, 1299 (D.Minn.1988) ("The mere fact that the Cu–7 received FDA approval does not, by itself, indicate that Congress impliedly intended to preclude state tort actions against prescription drug manufacturers. This is especially true in light of the widely held view that FDA regulation of pre-

scription drugs establishes minimum standards, both as to design and warning"); citing *Graham v. Wyeth Labs.,* 666 F.Supp. 1483 (D.Kan.1987), *Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981) and *Salmon,* 520 F.2d 1359; *Mazur v. Merck & Co.,* 742 F.Supp. 239, 247 (E.D.Pa.1990) ("mere compliance with FDA suggestion, or for that matter, regulation or order, does not mean that state tort law becomes irrelevant.... Compliance with an FDA regulation may establish that the manufacturer met the appropriate minimum standards of due care, but compliance does not necessarily absolve the manufacturer of all liability.... Manufacturers must meet state safety requirements, whether codified or embodied in the common law, in addition to satisfying initial FDA requirements"); *Motus v. Pfizer Inc.,* 127 F.Supp.2d 1085, 1092 (C.D.Ca.2000) ("[M]ost courts have found that FDA regulations as to design and warning standards are minimum standards which do not preempt state law defective design and failure to warn claims.... Indeed, Pfizer cites not a single case holding that FDA prescription drug requirements preempted state law claims.").

any or all indications and calls for a strengthened warning. Even after approval, additional or more forceful warnings may, in the drug manufacturer's judgment, be added to labeling *without prior FDA approval* and on the drug manufacturers own initiative. *See* 21 C.F.R. § 314.70. *See also Feldman,* 479 A.2d at 390; *Osburn v. Anchor Labs.,* 825 F.2d 908, 912 & n. 4 (5th Cir.1987) (relying on parallel provisions for warnings on animal drugs), *cert. denied,* 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988); *In re Tetracycline Cases,* 747 F.Supp. 543, 549–550 (W.D.Mo.1989) (noting that warnings on antibiotics may be added to the label in advance of FDA approval and that there are other means for disseminating warning information which would not conflict with federal requirements); Beverly L. Jacklin, *Federal Pre-emption of State Common-law Products Liability Claims Pertaining To Drugs, Medical Devices, and Other Health-related Items,* 98 A.L.R.Fed. 124, at § 4(b), 1990 WL 675329 (1990) ("If change were permissible without prior FDA approval, there would be no apparent conflict between federal regulations and a state court decision imposing liability for failure to make such a change. On the other hand, if prior approval was required, compliance with both the federal regulations and such a state ruling would be impossible—one criterion for finding federal pre-emption."). Thus, it is possible for drug manufacturers to strengthen existing warnings or at least to petition for a strengthening of the warnings. The regulations contemplate this exact situation.

In fact, in the preamble to its drug labeling regulations, the FDA emphasized that drug manufacturers may add warnings without prior approval:

The Commissioner ... advises that these labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (*e.g.,* 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

\* \* \* \* \* \*

In considering these regulations in a product liability case, at least one court has held that an NDA holder may have a duty to add a warning before FDA approval of a supplemental application. See *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974). 44 Fed.Reg. 37,434, 37,447 (1979) (citing *McEwen v. Ortho Pharmaceutical* without criticism). *See also* 21 C.F.R. § 314.70(c)(2)(i) (1993); 44 Fed.Reg. 37,-434, 37,447 (1979) (explaining that this regulation "permits the addition to the drug's labeling or advertising of information about a hazard without advance approval of the supplemental application by FDA"). *See also Noyola v. Johnson & Johnson,* 1987 WL 13586, \*2 (N.D.Ill. July 8, 1987).

■ Until 1965, the FDA regulations applicable to drugs prohibited companies from adding warnings or other information without prior approval. *See* 25 Fed.Reg. 12,592, 12,595 (1960). These regulations were amended in 1965, allowing labeling changes related to safety to be "placed into effect at the earliest possible time," the goal of which was for drug manufacturers "to enable prompt adoption of such changes." 30 Fed.Reg. 993 (1965).[12] Lia-

**12.** 30 Fed.Reg. 993 also reads: "The Commissioner of Food and Drugs has concluded that in the interest of safety certain kinds of

changes in labeling ... should be placed into effect at the earliest possible time."

bility, irrespective of the Food, Drug, and Cosmetic Act ("FDCA"), may attach if drug manufacturers do not at least request FDA approval of an additional warning as soon as new hazards or elevated risk associations are discovered. *See In re Tetracycline Cases,* 747 F.Supp. at 550; *cf. Sterling Drug, Inc. v. Yarrow,* 408 F.2d 978, 991–992 (8th Cir.1969); *Miller v. Upjohn Co.,* 465 So.2d 42, 45 (La.Ct.App.) (jury "could reasonably have found that Upjohn was tardy in applying for the warning label"), *cert. denied,* 467 So.2d 533 (La.1985). These options for conveying additional risk information are not prohibited but encouraged.

Because there is no indication that Congress and the FDA have attempted to impede what the FDA has referred to as the "sophisticat[ed] and complex[ ] private tort litigation in the United States," 59 Fed.Reg. 3944, 3948 (1994), this Court is right to interpret the FDA standards as minimum ones and to find that drug manufacturers still have a duty to timely disclose new known risks to learned intermediaries, especially because any other interpretation would run contrary to what appears to be an intent to preserve these tort remedies.

In enacting the FDCA, Congress enacted no general preemption provision. While Congress did enact such a provision for things like medical devices, it choose ‘not to with respect to prescription drugs. Thus, the normal practice Congress employs when it is attempting to carve out areas of preemption was specifically not done with respect to prescription drugs. *See, e.g., Hillsborough,* 471 U.S. at 714–23, 105 S.Ct. 2371 (FDCA did not preempt local ordinances concerning collection of blood); *Pharmaceutical Society of the State of New York v. Lefkowitz,* 586 F.2d 953, 958 & n. 6 (2d Cir.1978) (state requirement that drug manufacturer be identified on the label not preempted);

*Kellogg Co. v. Mattox,* 763 F.Supp. 1369, 1379 (N.D.Tex.) (state restrictions on health claims appearing on food labels not preempted), *aff'd mem.,* 940 F.2d 1530 (5th Cir.1991). The absence of an express preemption (like 7 U.S.C. § 136v(b) or 21 U.S.C. § 360k(a)), though not precluding implied preemption, is some evidence against congressional intent to scrap almost the entire scheme for state law products liability cases based on failure to warn.

■ What Congress did intend to do is delegate broad authority to an administrative agency, the FDA, to regulate consumer product labeling. But a broad delegation and the highly-regulated nature of the relationship between the FDA and drug manufacturers does not itself establish preemption. *See Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (finding that the highly-regulated scheme established by the Atomic Energy Act of 1954 did not implicitly preempt state tort law liability for nuclear power plant accidents). *Cf. Hillsborough,* 471 U.S. at 717, 105 S.Ct. 2371 ("As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive.").

Despite Congress' choice against expressly preempting prescription drugs failure to warn case, federal agencies could presumably take the lead to ensure that their labeling requirements were not undermined by additional state warning requirements. In fact, the FDA did that with respect to particular warnings, namely, the OTC drug warnings, *see* 51 Fed. Reg. 8180, 8181 (1986) (Reye syndrome warning; "making it clear that this final rule preempts State and local labeling re-

quirements that are not identical to it"); 47 Fed.Reg. 54,750, 54,756 (1982) (general pregnancy warning for OTC drug products); 47 Fed.Reg. 50,442, 50,447–48 (1982) (tamper-resistant packaging and associated labeling requirements) (noting that, in issuing this final rule, "the FDA intends that the regulations issued in this document preempt State and local packaging requirements that are not identical to it in all respects ..."). *Cf.* 52 Fed.Reg. 34,698, 34,702–03 (1987) (CPSC warning requirement for products containing methylene chloride).

But Sandoz has not shown that the FDA has done this for Parlodel. In fact, there is evidence that the FDA has seen the utility of state products liability claims despite their approval of the prescription drug in question. *See, e.g.,* 59 Fed.Reg. 3944, 3948 (1994) (codified at 21 C.F.R. § 20.63(f)) ("FDA recognizes the sophistication and complexity of private tort litigation in the United States and the proposed preemption action is not intended to frustrate or impede tort litigation in this area. Indeed, FDA recognizes that product liability plays an important role in consumer protection."); 44 Fed.Reg. 37,434, 37,447 (1979) (citing *McEwen v. Ortho Pharma-*

*ceutical* without criticism); 43 Fed.Reg. 4214, 4214–15 (1978) (revised PPI for oral contraceptives) (stating that "whether particular labeling may alter manufacturers' liability in a given instance cannot be considered as a dispositive factor by the Commissioner"); 42 Fed.Reg. 37,636, 37,637 (1977) ("The Commissioner believes it proper that a regulation requiring such labeling be promulgated, notwithstanding the possibility that it may have an effect on a manufacturer's liability in isolated instances."; stating that "whether particular labeling [i.e., the estrogen PPI] may alter a manufacturer's liability in a given instance cannot be considered as a dispositive factor by the Commissioner"). Thus, Sandoz' reliance on some comments made by the Assistant to the Solicitor General who argued the case before the Supreme Court are not determinative, inasmuch as these comments indicate that the FDA believes that at least some failure-to-warn claims "are available" with respect to medical devices, *see* Buckman Oral Arg. Official Transcript, 2000 WL 1801621, at *21 (*"failure to warn ... claims are available ... insofar as they would [not] be asserting an essential element of the claim would be that the FDA was defrauded").[13]* Ac-

---

**13.** Because Sandoz selectively inserted ellipses in carefully calculated places this Court reproduces the relevant questions by the Court and the answers given by the Assistant to the Solicitor General:

QUESTION: So the category of people who might exist—I'm not suggesting that's this case, but who might have been injured by that fraud would have absolutely no remedy?

MR. GORNSTEIN: The only remedies they would have are the other remedies that State laws affords *if the product was —*

QUESTION: But I—they're preempted.

MR. GORNSTEIN: Well, let me just continue. The fraud claim is preempted, but *if there is negligent design, negligent manufacturing, failure to warn, common law malpractice, all of those claims are available,* but insofar as they would be asserting an

essential element of the claim would be that the FDA was defrauded, that is an area of exclusive Federal concern, and the State common law cause of action would be preempted.

Actually, the position taken by the FDA, through the Assistant to the Solicitor General, does not disavow the continued vitality of "remedies that States law affords" for certain "failure to warn" claims; actually, the implication is the opposite. The Carakers also alert this Court of the circumstances surrounding the denial of *certiorari* by the United States Supreme Court in the case of *Smiths Industries Medical Systems, Inc. v. Kernats,* 522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998), which was issued after the Supreme Court invited and received briefing by the Solicitor General. There is some indication from the *Buckman* briefs that "the United States itself recognizes that premarket ap-

cordingly, Sandoz failed to demonstrate clear evidence of any actual conflict.

Third, Sandoz failed to overcome the anti-preemption presumption by showing clear evidence that the Carakers' claims based on failure to warn theories should be implied preempted based on the contravention of a federal objective. That is, Sandoz failed to show that the challenged state law (*i.e.*, a common law duty to adequately warn physicians prescribing Parlodel of an elevation in the risk of taking the drug) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. As already stated, the regulations specifically contemplate that the FDA determination of drug safety given the warnings existing at the time of application would not always be accurate after additional post-application information surfaces. *See* 30 Fed. Reg. 993 (1965). Sandoz may have a federal duty to supplement the information before the FDA, but Sandoz is not prohibited from unilaterally strengthening the warnings before FDA approval. It is. exactly in this situation that the State common law duty would attach. That duty would require Sandoz to *timely* alert patients (through their learned intermediaries) of an increased risk associated with Parlodel. The common law duty to promptly alert physicians prescribing Parlodel of an elevation in the risk of taking Parlodel stands as no obstacle to the accomplishment and execution of the full purposes and objectives of the regulations. Sandoz was neither prohibited from

strengthening the warnings and information it provides to consumers and health practitioners on its package and package insert, nor prohibited from petitioning the FDA for strengthened warnings. *See Motus*, 127 F.Supp.2d 1085. The full purpose and objective of the regulations necessarily includes the notion that drug manufacturers must exercise their own judgment in deciding when to strengthen a warning prior to FDA approval. All the state law would say is simply that drug manufacturers' judgment must not be unreasonable. This stands as no obstacle to the accomplishment and execution of the full purposes and objectives of the regulations.

Drug manufacturers have endlessly attempted to argue for preemption on the basis that the federal regulation of drug labels and package inserts would be undermined if state law imposed greater warning duties (*i.e.*, those of content and of timeliness) on drug manufacturers that supplemented the warning label on the approved drug, but courts have generally still found no preemption.[14] *In re Tetracycline Cases*, 747 F.Supp. 543 (W.D.Mo. 1989), is a good example. There, the court held that state common law claims based on failure to warn theories were not preempted by federal regulation of antibiotic drugs where the manufacturers might have taken other action supplementing and complimenting FDA warning requirements and that such actions need not be inconsistent or conflicting with federal requirements. The court reasoned that warnings on antibiotics may be added to the label in

---

proval of medical devices does not preempt state-law design defect claims, negligent manufacturing claims, or failure-to-warn claims. *See generally* Brief for United States as Amicus Curiae in *Smith Industries Medical Systems v. Kernats*, S.Ct. No. 96–1405 at 14–18 [522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998)]." *Buckman*, Brief of Amicus Curiae of Public Citizen in Support of Respondent, 2000 WL 1591269, at *11. But, unfor-

tunately, a copy of that brief is unavailable on Westlaw or Lexis and has not been submitted by either party.

**14.** For a collection of cases, see Janet Fairchild, Annotation, *Liability of Manufacturer or Seller for Injury or Death Allegedly Caused by Failure to Warn Regarding Danger in Use of Vaccine or Prescription Drug*, 94 A.L.R.3d 748, 1979 WL 52377 (1979).

advance of FDA approval and that there are other means for disseminating warning information which would not conflict with federal requirements. *See Mazur*, 742 F.Supp. at 247 (finding no preemption because "Merck can petition the FDA to allow it to change its package insert" and thus "could meet both federal and state law requirements"). The court noted that the FDA allows manufacturers to take the initiative to revise the labeling and warnings "as soon as there is reasonable evidence of an association of a serious hazard with a drug." 21 C.F.R. § 201.57(e) (1996). The court noted that warnings on antibiotics may be added to the label in advance of FDA approval and that there are other means for disseminating warning information which would not conflict with federal requirements. *See In re Tetracycline Cases*, 747 F.Supp. at 549–50. *See also Feldman*, 592 A.2d at 1192–94; *Feldman*, 479 A.2d at 390; *cf. Osburn*, 825 F.2d at 912 & n. 4 (relying on parallel provisions for warnings on animal drugs).

Thus, because Sandoz has not shown that Congress or the FDA clearly intended to scrap the traditional state products liability failure to warn claims by initially approving drugs as labeled for marketing, this Court applies the anti-preemption presumption to find that the Carakers' state law claims based on failure to warn theories are not impliedly preempted. This anti-preemption presumption is not inconsequential, inasmuch as it "serves as a limiting principle that prevents federal judges from running amok with [the] potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes...." *Geier*, 529 U.S. at 907, 120 S.Ct. 1913 (J. Stevens, dissenting,

joined by Justices Souter, Thomas, and Ginsberg). *Cf. Lorillard*, 121 S.Ct. at 2441 (J. Stevens, dissenting, joined by Justices Ginsberg, Breyer, and Souter) ("As the regulations at issue in this suit implicate ... [the] power to protect the health and safety ..., our precedents require that the Court construe the [express] preemption provision 'narrow[ly].' If Congress' intent to preempt a particular category of regulation is ambiguous, such regulations are not preempted.").

In this case, there is no "clear evidence" of intent to preempt by means of a conflict. First, Congress expressly preempted other areas in Title 21, but it chose not to with respect to prescription drugs. Second, as stated, it is not clear whether FDA approval meant a drug manufacturer was meeting *minimum* standards of safety or *conclusive* standards on safety.[15] Third, the FDA's specific position on implied preemption of products liability cases like these is not clear. Fourth, Sandoz may unilaterally strengthen a warning without prior FDA approval and the FDA has cited without criticism cases that have found such a duty. Fifth, it rather difficult to believe that Congress or the FDA would, without comment, remove all means of judicial redress for those injured. *See Silkwood*, 464 U.S. at 251, 104 S.Ct. 615 ("[T]here is no indication that Congress even seriously considered precluding the use of such remedies either when it enacted the Atomic Energy Act in 1954 and or when it amended it in 1959. This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress would, without comment, remove all means of ju-

---

**15.** Interestingly, on the Summary For Basis Approval and under the heading "Conclusion Relative to Safety," the FDA stated that Parlodel *"appears* both safe and effective for this

supplemental indicator," not that Parlodel *"is* both safe and effective for this supplemental indicator" (Doc. 271, Ex. 21).

dicial recourse for those injured by illegal conduct.").

All these things point to one conclusion: Sandoz has failed to show by clear evidence that Congress or the FDA intended on displacing almost the entire state products liability scheme with respect to prescription drugs by means of a conflict. Without this clear evidence or preemptive intent, this Court is wary to immunize the entire pharmaceutical drug industry which Congress itself believed needed to be better watched.. Therefore, this Court applies the presumption and finds that the Carakers products claims based on failure to warn theories are not impliedly preempt. *See Buckman*, 121 S.Ct. at 1019 (distinguishing *Silkwood* because, "[i]n the present case ... we have *clear evidence* that Congress intended" preemption).

*Buckman* does not mandate a different result. In *Buckman*, the plaintiffs' claim was a "fraud on the FDA" cause of action, one essential element of which was that the FDA was defrauded. The Court noted that, because the "the existence of these federal enactments is a critical element" in their "fraud on the FDA" claim, it was preempted. *See Buckman*, 121 S.Ct. at 1020.[16] Here, the Carakers are not asserting fraud on the FDA claims, and a finding of a specific violation of the FDCA is not a necessary element of any of the Carakers' torts. Indeed, the regulations concerning pharmaceutical drugs specifically allow drug manufacturers to, on their own initiative, strengthen a warning if they believe the existing warning is inadequate. 21 C.F.R. § 314.70(c)(2)(ii). Therefore, *Buckman's* specific holding, narrowly read, is not controlling.[17]

---

**16.** Interestingly, the *amicus curiae* brief filed on behalf of Novartis noted the peculiarity of the cause of action being precluded in *Buckman:*

> [R]espondents' state-law claims do not arise from traditional areas of state authority. Rather, they are premised on the *peculiar theory* that liability under state law arises from fraud on a federal agency.

*Buckman*, Brief of Amicus Curiae Pharmaceutical Research and Manufacturers of America in Support of Petitioner The Buckman Company, 2000 WL 1339143, at *3 (emphasis added). Novartis further recognized the uniqueness of the cause of action being precluded in *Buckman:*

> Moreover, respondents' claims are of a different character from those in *Medtronic. Medtronic* involved state-law claims in areas of traditional state concern; *i.e., product liability and negligence.* 518 U.S. at 481, 116 S.Ct. 2240. Here, by contrast, respondents' claims are based on the odd premise that liability under state law may arise when an actor commits "fraud" on a federal agency. Certainly, the relationship between federal agencies and those they regulate is not a field of historic state concern or legislation. *See* Brief of United States, at 15. Thus, the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest

purpose of Congress" does not apply here. *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

*Id.* at *8–*9 (emphasis added). Furthermore, the United States also observed:

> The *Medtronic* plaintiffs' claims of defective design, negligent manufacturing, and negligent failure to warn all implicated core areas of traditional state concern. The Court therefore began its analysis in *Medtronic* with a "presumption" that Congress did not intend to preempt those claims.... The situation here is fundamentally different. Respondents' fraud-on-the-FDA claims do not depend on any showing that the device had a defective design, was negligently manufactured, or did not bear adequate warnings under state law.

*Buckman*, Brief of Amicus Curiae United States in Support of Petitioner, 2000 WL 1364441, at *17.

**17.** Courts have generally read *Buckman's* specific holding rather narrowly. *See Green v. Fund Asset Management, L.P.*, 245 F.3d 214, 223 n. 7 (3rd Cir.2001) (distinguishing *Buckman* because, "[u]nlike the plaintiffs in *Buckman*, the plaintiffs in the case at bar allege not fraud against a federal agency, but rather violations of state and federal securities

There are a number of things worth saying, however, about *Buckman*. First, *Buckman* reaffirmed the principle that the first thing courts must address is whether there is an anti-preemption presumption. Again, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause" which mandates against preemption " 'unless that was the clear and manifest purpose of Congress.' " *Hillsborough*, 471 U.S. at 715, 105 S.Ct. 2371 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). *Buckman* found that no anti-preemption presumption applied in "fraud on the FDA" claims, inasmuch as "[p]olicing fraud against federal agencies [was] hardly 'a field which the States have traditionally occupied.' " *Buckman*, 121 S.Ct. at 1017 (quotation omitted). Unlike *Buckman*, the anti-preemption presumption applies in this case, because timely warnings as to the risks of ingesting dangerous prescription drugs falls within the "historic primacy of state regulation of matters of health and safety." *Id.* (citing *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240). Thus, as already stated, this Court has started with a presumption against finding federal preemption of the state

common law torts based on failure to warn allegations.[18]

*Buckman* also distinguished rather than overruled *Medtronic*. While briefly noting the apparent preemption-type dissimilarity (*i.e.*, *Medtronic's* preemption was express while *Buckman's* was implied), the *Buckman* Court distinguished *Medtronic* on the basis that the *Medtronic* claims arose from "the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA requirements." *Id.*, 121 S.Ct. at 1020. The *Buckman* Court also noted that, unlike the claims in *Medtronic*, the *Buckman* "fraud claims exist *solely* by virtue of the FDCA disclosure requirement." *Id.* (emphasis added).[19]

Interestingly, in *Medtronic*, the plaintiff pacemaker recipient sued the manufacturer of the pacemaker because of a defective electrical lead in the device. The plaintiff alleged state common law negligence and strict liability claims for defective design, failure to warn, and negligent manufacturing. Reading *Medtronic* and *Buckman* together, it is not altogether clear that state law claims based on inadequate warnings were intended to be preempted, especially in the area of prescription drugs. This is especially true where the

laws"); *McCall v. PacifiCare of California, Inc.*, 25 Cal.4th 412, 106 Cal.Rptr.2d 271, 21 P.3d 1189, 1199 n. 9 (2001); *Dawson ex rel. Thompson v. Ciba–Geigy Corp., USA*, 145 F.Supp.2d 565, 572–73 (D.N.J.2001) (similar narrow reading of *Buckman* in a removal context). Indeed, the Court, in *Buckman*, seemed to go out of its way to focus on the fact that the federal enactment at issue was absolutely critical to the plaintiff's "fraud on the FDA" claim.

**18.** This presumption is something that the *Mitchell* court did not even reference because, there, the court was determining the *scope* of an express preemption provision, not whether preemption was intended in the first place. *See Cipollone*, 505 U.S. at 533, 112 S.Ct. 2608

(J. Blackmun, concurring in part and dissenting in part) ("The principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find pre-emption where Congress has not spoken directly to the issue apply with equal force where Congress has spoken, though ambiguously. In such cases, the question is not whether Congress intended to pre-empt state regulation, but to what extent.").

**19.** A requirement that drug companies timely disclose known risks, or material additional risks not previously disclosed, falls comfortably within a State's general and traditional common law duty to warn, and does not "exist *solely* from the violation of FDCA requirements."

claims were based on "traditional state tort law which had predated the federal enactments in questions" and could conceivably be claims "that parallel federal safety requirements." *Buckman,* 121 S.Ct. at 1020. In distinguishing *Medtronic,* the *Buckman* Court also intimated that an argument like Sandoz' "intrinsically intertwined with FDA fraud" argument would prove unconvincing, because it too broadly attempted to re-characterize *all* claims as being somehow tied to FDA fraud or the drug manufacturer's relationship with the FDA. *See id.* Indeed, the *Buckman* Court observed that *Medtronic* still allows "certain state-law causes of action that parallel federal safety requirements." *Id.* Unfortunately, the Court did not elaborate much on this observation.

Even though drug manufacturers have obligations under the regulations, they also have a parallel duty to warn under Illinois law that predated the existence of the federal enactments in question. Keeping this in mind, the majority's opinion in *Buckman* is instructive:

> In sum, were plaintiffs to maintain their fraud-on-the-agency claims here, they would not be relying on traditional state tort law which had predated the federal enactments in questions. On the contrary, the existence of these federal enactments is a critical element in their case.

*See id.* Here, manufacturers of potentially harmful products already had the duty to timely warn under Illinois' common law. And it is unnecessary to get the approval of the FDA to make a package insert change to add information about safety or

to enhance a warning (Doc. 256, at p. 4). Illinois' duty to warn—the basis of the Carakers' claims—existed before the regulations at issue, and the existence of the regulations is not the "critical element" of the Carakers' claims. *Buckman,* therefore, does not mandate a different result.

*Mitchell* does not mandate a different result either.[20] In *Mitchell,* the plaintiff was injured by collagen compound injections, Class III medical devices, and sued the compound manufacturer asserting various state law product liability claims. The manufacturer argued that (1) the FDA's approval of the device pursuant to the premarket approval process for medical devices was a federal "requirement"; (2) the plaintiff's state law claims would impose additional "requirements" under the MDA with respect to safety; and (3) the States were prohibited from adding any extra "requirements" (including common law duties) concerning the safety with respect to the medical devices because, through the express preemption provision, Congress explicitly prohibited additional state law "requirements" if they were "different from, or in addition to" the FDA's standard. *See* 21 U.S.C. § 360k(a). *See also Geier,* 529 U.S. at 867, 120 S.Ct. 1913 (refusing to address dissimilarities between medical device "requirements" and motor vehicle "standards").[21]

Though *Mitchell* spoke about a similar premarket approval process, it was a medical devices case, and there is a pretty clear express preemption provision evidencing congressional preemptive intent. On the other hand, this case is a prescription drug

20. *Mitchell* was decided after the Supreme Court remanded the underlying case back to the Seventh Circuit in light of *Medtronic,* which held that certain state common law claims were not preempted based on the express provision of the Medical Devices Act.

21. The Carakers point out that the reasoning *Mitchell* used has been expressly rejected by some courts, *see, e.g., Weiland v. Telectronics Pacing Systems, Inc.,* 188 Ill.2d 415, 242 Ill. Dec. 618, 721 N.E.2d 1149 (1999) ("[W]e believe [*Mitchell*] was wrongly decided."). Also, Sandoz argues that *Buckman* overruled other parts of *Mitchell* (Doc. 258, at p. 5 n. 5).

case, and there is no comparable clear evidence of congressional or FDA intent to preempt. Also, *Mitchell* held that there would be a conflict because Congress, as evidenced in the express preemption provision, intended the FDA's safety standard to be conclusive when dealing with medical devices. Thus, the *Mitchell* court held that no additional or different "requirements" as to the safety and effectiveness of medical device warnings could be added on by the States because, in the area of medical devices, Congress charged the FDA with the task of "set[ting] forth extensive and *exclusive requirements* in this area." *Mitchell*, 126 F.3d at 909. *See also Kuiper v. American Cyanamid Co.*, 131 F.3d 656 (7th Cir.1997) (finding clear evidence of congressional preemptive intent in Congress' express provision in the Federal Insecticide, Fungicide, and Rodenticide Act, which forbade any "State ... requirements for labeling or packaging in addition to or different from those required under this subchapter"). *Mitchell* also noted that, because of the express preemption provision, the question was not whether preemption was intended but rather the extent of the preemption. *See Medtronic*, 518 U.S. at 484, 116 S.Ct. 2240; *Mitchell*, 126 F.3d at 907.

As this Court sees it, one crucial question in this case is whether Sandoz has shown, by clear evidence, that either Congress or the FDA intended its label/insert warning requirements for a particular drug label to be the conclusive standard of safety *ad infinitum* or to be a minimum standard of safety at the time of initial drug approval. In the devices cases, Congress stated expressly that the States cannot dictate warning "requirements" with respect to a specific device in addition to those required by the FDA with respect to that particular device. *See Mitchell*, 126 F.3d at 913–14. Under *Mitchell*, that was what constituted the required "clear evidence" that Congress intended on

"set[ting] forth extensive and *exclusive requirements* in this area," thereby precipitating the direct conflict between the FDA requirements and additional State law ones. *Id.* at 909. On the other hand, in the prescription drug cases, the answer is less transparent, and there is no comparable express preemption exemption that might have served as the bright beacon heralding congressional preemptive intent. *Cf. Hurley v. Lederle Laboratories*, 863 F.2d 1173, 1176 n. 2 (5th Cir.1988) (citing 14 federal district court and three state court decisions involving vaccines that rejected preemption defense); *Abbot by Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1112 n. 1 (4th Cir.1988) (citing nine federal district court decisions involving vaccines and rejecting preemption defense), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). Put another way, unlike the express intent to prohibit additional state law "requirements" with respect to medical devices, which was at issue in *Mitchell*, there is no clear evidence of intent to prohibit state common law failure to warn claims with respect to prescription drugs which would have evidenced Congress' intent that the FDA's requirements be conclusive with respect to the safety of the drug.

Sandoz has not cited any controlling case holding that the FDA's prescription drug warning standards were intended on preempting almost all products liability claims in every State of the Union. *See Motus*, 127 F.Supp.2d 1085. And simply because the pharmaceutical drug industry is highly-regulated does not dictate a finding of implied preemption. *See Silkwood*, 464 U.S. 238, 104 S.Ct. 615 (finding that the highly-regulated scheme established by the Atomic Energy Act of 1954 did not implicitly preempt state tort law liability for nuclear power plant accidents); *Medtronic*, 518 U.S. at 507, 116 S.Ct. 2240 (noting that "this Court has previously

said that it would 'seldom infer, solely from the comprehensiveness of federal regulations, and intent to pre-empt in its entirety a field related to health and safety'"). *Cf. English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (holding that nuclear fuel production employee's state law claim for intentional infliction of emotional distress was not preempted by the Energy Reorganization Act).[22]

▮▮▮ While Congress could admittedly do away with the state remedial system entirely if it so wished (as *Mitchell* held Congress did by enacting the express preemption provision with respect to medical devices), courts should be reluctant in cavalierly implying "clear evidence" of intent to immunize an entire industry from liability, even highly-regulated ones, or cavalierly implying "clear evidence" of a conflict. *See Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240 ("[W]e have long presumed that Congress does not cavalierly pre-empt state-law causes of action [especially] in a field which the States have traditionally occupied, unless that was the clear and manifest purpose of Congress."). Even in fields of such overriding national interest as safety regulation of nuclear power, the Supreme Court has found no inconsistency between "vest[ing] the NRC with exclusive regulatory authority over the safety aspects of nuclear development while at the same time allowing plaintiffs like Mr. Silk-

wood to recover for injuries caused by nuclear hazards." *Silkwood,* 464 U.S. at 258, 104 S.Ct. 615. This is especially true when either Congress or the FDA could have easily inserted statutory or regulatory preemption language relating to prescription drugs after the majority of courts found no preemption with respect to prescription drugs under the minimal standards rationale. In summary, the several principles used in preemption analyses support a finding against preemption in this case:

> When Congress does not expressly state its intent, there is a presumption against preemption. *Maryland v. Louisiana,* 451 U.S. 725, 726, 101 S.Ct. 2114, 2118–19, 68 L.Ed.2d 576 (1981). The presumption is even stronger with state or local regulation of matters related to health and safety. *Hillsborough,* 471 U.S. at 715, 105 S.Ct. at 2376. Courts are more reluctant to infer preemption from the comprehensiveness of regulations than from the comprehensiveness of statutes. *Id.* at 717, 105 S.Ct. at 2377. When preemption by regulation is considered, courts are reluctant to find preemption by federal regulations when the agency does not make very clear an intent of preemption since agencies normally address problems in a detailed manner. *Id.* at 718, 105 S.Ct. at 2377–78. The presumption against preemption is even stronger against pre-

---

**22.** This Court is aware that Sandoz is not technically basing their argument on field preemption, but their argument, followed to its logical conclusion, would lead to prescription drug field preemption. For example, they argue that, because the FDA has "determined" that drugs with their approved warnings are conclusively safe, state common law failure to warn claims against the pharmaceutical manufacturers can no longer be brought in any court. Also, Sandoz argues that even state common law actions that involve allegations that they violated the FDA regulations are preempted, an argument that it appears

*Medtronic* rejected. 518 U.S. at 495, 116 S.Ct. 2240. *Buckman* held that fraud on the FDA was implied preempted because an essential element of the advanced cause of action was the defrauding of the FDA. Absent that federal regulation against defrauding the FDA, the *Buckman* plaintiffs had no viable cause of action. *See* 121 S.Ct. at 1020. *Buckman* also implied that *Medtronic* was still good law. Deciphering *Buckman* and *Medtronic* is also confounded by the fact that those cases involved medical devices, while this case involves prescription drugs.

emption of state remedies, like tort recoveries, when no federal remedy exists. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 622–23, 78 L.Ed.2d 443 (1984).

*Abbot by Abbot*, 844 F.2d at 1112. Because it is far from clear that Congress through the FDA intended to grant the entire pharmaceutical industry immunity from suits against the injured, and because Sandoz has failed to come forward with "clear evidence" of preemptive intent in the context of prescription drugs or of a conflict, this case is distinguishable from *Mitchell.* *See Medtronic*, 518 U.S. at 507, 116 S.Ct. 2240 (noting that "this Court has previously said that it would 'seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empt in its entirety a field related to health and safety' ").[23]

Having found that Sandoz has not carried its burden of showing that the Caraker's prescription drug products claims based on a failure to warn are preempted by *Buckman, Mitchell,* or the general rules governing implied conflict preemp-

tion, this Court **DENIES** Sandoz' *Buckman* summary judgment motion (Docs.254). This Court reserves ruling on the other pending motions for summary judgment dealing with design defect, failure to warn, and punitive damages until after the *Daubert* hearing. This Court notes that if no causation evidence survives the *Daubert* hearing, Sandoz is entitled to summary judgment on all claims, and this case is over.

## C. *Miscellaneous Motions*

The parties have also filed various other motions: (1) Sandoz' motion for order to preclude reference to Dr. Karl Engelman's Conviction on Misdemeanor Charges in August 1978 (Doc. 274), (2) the Carakers' motion to supplement their memorandum in opposition to Sandoz' motion *in limine* to exclude causation testimony and to include new exhibits (Doc. 304), and (3) Sandoz' unopposed motion to strike the Caraker's response to Sandoz' notice of affirmance of previously cited authority (Doc. 305). This Court will deal with each one in turn.

---

**23.** *Mitchell's* narrow holding was actually this: "We believe that this claim is preempted by the PMA process for a Class III medical device." *Mitchell*, 126 F.3d at 913. So the statement in *Mitchell*, "[a]pproval by the FDA constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling," must be read with respect to medical devices. Too broad a reading of *Mitchell* and too broad an application of it to the area of conflict preemption would have rippling effects in other areas where federal agencies promulgate safety standards and certify certain products as meeting those safety standards. For example, the Federal Aviation Administration promulgates "airworthiness standards" for aircraft and certifies an aircraft as airworthy before it may fly. *See also Gaubert v. United States*, 885 F.2d 1284 (5th Cir.1989); *G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.*, 958 F.2d 896 (9th Cir.1992). The Supreme Court has referred to this process as creating "minimum safety standards," the compliance with which is signified by the FAA's "approval by issuing a type certificate." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *Cf. Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 259, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) ("If Piper and Hartzell can show that the accident was caused not by a design defect, but rather by the negligence of the pilot, the plane's owners, or the charter company, they will be relieved of all liability."). *See also Public Health Trust of Dade County, Fla. v. Lake Aircraft, Inc.*, 992 F.2d 291 (11th Cir.1993) (rejecting airplane manufacturers' arguments that compliance with airworthiness standards preempts state design defect claims); *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 242, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (Justices O'Connor and Thomas relying on *Public Health Trust* for support).

First, because Sandoz will not be calling Dr. Karl Engelman as a witness at the *Daubert* hearing (*See* Doc. 308), Sandoz' motion for an order to preclude reference to Dr. Karl Engelman's Conviction on Misdemeanor Charges in August 1978 (Doc. 274) is **DENIED as moot.**

Second, Sandoz filed a motion to strike the Carakers' response to Sandoz' notice of affirmance of previously cited authority (Doc. 305). Originally, Sandoz relied on the case of *Glastetter v. Novartis Pharms. Corp.,* 107 F.Supp.2d 1015 (E.D.Mo.2000), which excluded a Parlodel plaintiff's experts' opinions that Parlodel caused her stroke because it was scientifically unreliable. Thereafter, the Eighth Circuit affirmed that decision. *See Glastetter,* 252 F.3d 986. In a one-page non-argumentative document, Sandoz alerted this Court of the intervening affirmance. In response to Sandoz' notice of affirmance, the Carakers launched into a six-page argumentative response brief, the first sentence of which states that they "do not oppose" the notice of affirmance. At that point, any further argument violated (or was an attempt to circumvent) this Court's March 23, 2001, Order, imposing restrictions on the motion practice relating to Sandoz' motion to exclude the Carakers' experts' testimony based on *Daubert.* Therefore, Sandoz' motion to strike (Doc. 305) is **GRANTED,** and the Carakers' six-page argumentative brief (Doc. 301) is **STRICKEN** from the record.

Third, the Carakers' have moved to supplement their memorandum in opposition to Sandoz' motion *in limine* to exclude causation testimony and amend the list of exhibits upon which their experts relied in forming their opinion (Doc. 304). Specifically, the Carakers seek to introduce a text that Dr. Petro recently came across at a recent convention. Though this evidence changes none of the methodology of Drs. Petro and Kulig opinions, the text is short, was discovered after this Court issued its ruling imposing the briefing schedule relating to the *Daubert* hearing, and makes an observation on an association between bromocriptine and stroke. The motion to supplement the record (Doc. 304) is **GRANTED.**

## III. *CONCLUSION*

For the foregoing reasons, this Court:

- **DENIES** Sandoz' reconsideration motion (Doc. 201);

- **DENIES** Sandoz' *Buckman* summary judgment motion (Doc. 254);

- **DENIES** as moot Sandoz' motion for order to preclude reference to Dr. Karl Engelman's Conviction on Misdemeanor Charges in August 1978 (Doc. 274);

- **GRANTS** the Carakers' motion to supplement their memorandum in opposition to Sandoz' motion *in limine* to exclude causation testimony and to include new exhibits, along with Sandoz' response (Doc. 304); and

- **GRANTS** Sandoz' unopposed motion to strike the Caraker's response to Sandoz' notice of affirmance of previously cited authority (Doc. 305).

**IT IS SO ORDERED.**